(96 South. 118)

No. 24599.

## CUSIMANO v. A. S. SPIESS SALES CO.

(April 2, 1923.)

*(Syllabus by Editorial Staff.)*

1. **Master and servant** ⟜302(1)—**Master not relieved from liability by every deviation by employee from duty.**

It is not every deviation from direct line of duties on part of employee that constitutes a turning aside from his master's business.

2. **Master and servant** ⟜305—**Master liable though servant violates instructions.**

Master's liability for servant's acts does not cease merely because the servant is acting contrary to, or in defiance of, express instructions from the master.

3. **Master and servant** ⟜302(6)—**Master not liable for acts of servant in own interest.**

Servant must have abandoned and turned aside completely from the master's business to engage in some purpose wholly his own before the master ceases to be liable for his acts.

4. **Master and servant** ⟜302(6)—**Master's liability reattaches when servant resumes duties.**

Though servant may have turned aside from master's business, master's liability for his acts reattaches as soon as the servant resumes the master's business.

5. **Master and servant** ⟜302(6)—**Master held liable when servant had fulfilled own purpose and was returning to resume duties.**

Though employee engaged in making deliveries turned aside from employer's business for some purpose of his own, where he had fulfilled such purpose and was either continuing deliveries or returning to employer's store, the employer was liable for his negligence.

6. **Damages** ⟜97—**$3,000 allowed for fracture of skull.**

Where plaintiff suffered fracture at base of skull and was in hospital a week or 10 days, but within a month was able to attend to his own affairs, and the evidence of his sufferings and general condition was meager, $3,000 would be a proper award of damages.

7. **Death** ⟜76—**Evidence held insufficient to show death from accident.**

In action for injuries causing fracture of skull, in which claim for death was subsequently interposed, evidence *held* insufficient to show that the death resulted from the accident.

Appeal from Civil District Court, Parish of Orleans; H. C. Cage, Judge.

Action by Nicholas Cusimano against the A. S. Spiess Sales Company, in which plaintiff's wife made herself a party after plaintiff's death. From a judgment for plaintiff, defendant appeals. Amended and affirmed.

Edward Rightor, John D. Nix, Jr., and W. Winn Wright, all of New Orleans, for appellant.

Sanders, Baldwin, Viosca & Haspel and William H. Byrnes, Jr., all of New Orleans, for appellee.

ST. PAUL, J. Plaintiff sued the defendant A. S. Spiess, doing business as A. S. Spiess Sales Company, for $20,125 as damages for personal injuries inflicted by an automobile belonging to said defendant and operated by a chauffeur in defendant's employ.

The negligence of the chauffeur is not disputed. He was running defendant's delivery truck at an excessive rate of speed, and, in order to avoid a collision with another vehicle in front of him, turned aside and crashed into the front of plaintiff's store, where plaintiff was then standing, knocking plaintiff down and injuring him severely.

## I.

The defense is that at the time of the occurrence the chauffeur was not engaged about defendant's business, but in purposes of his own, and there is some evidence by defendant's brother, who acted as shipping clerk, that, "as far as he can remember," the chauffeur had only four stops to make, and none of them would have taken him to the place where the accident occurred. On further examination he became more positive that there were but four stops to be made. The policeman who arrived at the scene immediately after the accident testified that the chauffeur

told him that he "was going up town to deliver some goods, and went home to get something, and had to hurry back, as he lost time." Plaintiff's son testified that the chauffeur told him, "I just come from delivering from back of town," but does not remember exactly where. At any rate it appears that the chauffeur was then on his way back either to continue his deliveries or to return to defendant's store.

The evidence is therefore not conclusive that the chauffeur was not engaged in his work of making deliveries, but, even conceding that the chauffeur had in fact turned aside from his master's business to go to his own home, or elsewhere, for purposes of his own, yet at the time of the accident he was returning to his occupation, and was therefore engaged about his master's business.

## II.

[1-3] It is not every deviation from the direct line of his duties on the part of an employee that constitutes a turning aside from his master's business. Duffy v. Hickey, 151 La. 274, 91 South. 733. Nor does the master's liability cease merely because the servant is acting contrary to, or even in defiance of, express instructions from his master, Winston v. Foster, 5 Rob. 113. But the servant must have abandoned and turned aside completely from his business, to engage in some purpose wholly his own, before the master ceases to be liable for his acts.

[4] And even though a servant may have turned aside from the master's business, yet the liability of the master reattaches as soon as the servant reassumes the business of his master.

[5] And the authorities hold that, when the servant, having completed the purpose for which he turned aside, is returning to resume his duties, he is, whilst so returning, engaged in the business of his master.

In Black v. Rock Island, A. & L. Ry. Co., 125 La. 105, 51 South. 83, 26 L. R. A. (N. S.) 166, this court said:

"There is really no positive testimony in the record as to the purpose of Fausnacht and Earnest in moving the train (as, for convenience, we shall call the engine and car) by which plaintiff was struck, out of the depot, but the inference is that it was done merely by way of celebrating the occasion, and with that view, of running over and exploding certain torpedoes which had been laid on the track; and that apparently was accomplished as the train passed down. When, however, plaintiff was injured, defendant's employees were engaged in taking the train back to the depot, where it belonged, and the basis upon which the learned counsel rest their argument that defendants cannot be held liable because, when the injury was inflicted upon plaintiff, their employees, to whose negligence it was attributed, were not engaged in the discharge of any service to them, or within the scope of their employment, *disappears entirely;* for, conceding that, in taking the train out of the depot, merely for their own amusement, the men whom defendants had placed in charge of it were rendering no service to defendants and were doing nothing they were employed to do, *it can hardly be denied that their duty to defendants as custodians of the property required that it should be returned to the place from which they had taken it.*" (Italics ours.)

It is true that the court said this was perhaps a narrow view of the case, though no narrower than that which would seek to release a master whose servant had turned aside momentarily for some purpose nominally his own, and then proceed to decide the case upon the "broader ground" that defendants, as owners of a public franchise, were bound to see that that franchise was used with due regard for public safety. But the fact is that the first ground of decision was clearly pertinent to the case and entirely applicable; and there is nothing in the rest of the opinion to indicate that those views were to be considered unsound. We think they were sound.

In Barmore v. Vicksburg, S. & P. Ry. Co., 85 Miss. 426, 38 South. 210, 70 L. R. A. 627,

3 Ann. Cas. 595, it was held, quoting for convenience the syllabus in 3 Ann. Cas. 595:

"The rule that, where a servant has made a temporary departure from the scope of his employment, the responsibility of the master for the tort of the servant attaches immediately after the purpose of such departure has been accomplished and as soon as the servant re-engages in the discharge of his duty, applies where an employee of a railroad company, whose duty requires him to use a railroad tricycle to aid in gathering wood, leaves the place, where he is thus employed, to carry a sick friend on the tricycle to a station, and, after leaving such friend at the station, injures a third person through his negligence in running the tricycle, though the accident happens before the servant reaches the place from which he started."

In the course of the opinion the court said:

"When did Watson resume his service, so as to render his master liable? His private affair was to carry a sick friend to the station, but when that was completed and he began to propel the railroad tricycle back over the route which he had previously traveled, with the intention and for the purpose of proceeding to the discharge of the duty which he was employed to perform, he then resumed his master's service, which had been suspended temporarily while he was engaged about his own affairs. The argument that Watson did not resume his duty until he actually reached the spot where he was to gather the fuel rests on no solid legal foundation. He was operating the appliance which it was his duty to operate. He was on the track at a place which he was compelled to pass over, and proceeding to the place where his duty called, for the purpose of performing that duty, and was at the time of the injury engaged about no affair of his own, but discharging in the usual and customary manner the business for which he was employed. Under such circumstances the master is answerable for the tort of the servant."

As authority for this holding the court cited Chicago Con. Bottling Co. v. McGinnis, 86 Ill. App. 38; M., K. & T. Ry. Co. v. Edwards (Tex. Civ. App.) 67 S. W. 891; Pittsburgh, C. & St. L. Ry. Co. v. Kirk, 102 Ind. 404, 1 N. E. 849, 52 Am. Rep. 675; also East St. Louis Connecting R. Co. v. Reames, 173 Ill. 586, 51 N. E. 68; Ritchie v. Waller, 63 Conn. 155, 28 Atl. 29, 27 L. R. A. 161, 38 Am. St. Rep. 361; Whatman v. Pearson, L. R. 3 C. P. 422, 37 L. J. C. P. 156.

We are therefore of opinion that, even if defendant's chauffeur had turned aside from defendant's business for some purpose of his own, yet at the moment of the accident he had fulfilled his own purpose, and was then in the act of attending to the business of his master either by continuing his deliveries or by returning to the store. And we think his master is liable for his negligence when so engaged.

### III.

[6] As to the measure of damages, we find that plaintiff suffered a fracture at the base of the skull, and remained at the hospital about a week or 10 days, when he was discharged not as cured, but as being better. It is shown that a fracture of the skull is one of the most severe injuries which a man could suffer. Doubtless the pain was great and the shock to the nervous system severe, but the evidence on the subject of plaintiff's sufferings and general condition is very meager, and we have concluded to allow for his injuries the sum of $3,000, in view of the fact that within one month after the accident plaintiff was sufficiently able to attend to his own affairs to file this suit and sign the petition personally; besides which there is also due plaintiff $100 for the cost of replacing a shed destroyed.

### IV.

[7] About 3½ months after the accident, and about 2½ months after filing the petition, plaintiff died. His wife made herself party to this suit as successor to his own claim, and in her own behalf sued for damages to herself growing out of the death of her husband, which she attributed to this accident.

We have examined the evidence in this case, and our conclusion is that it does not show with anything even approaching cer-

tainty that plaintiff died as a result of the injury sustained by him.

The physician who treated him at the hospital, to which he was taken at once, was not asked about the cause of death, and probably did not know. The physician who attended him afterwards testified that it was a possibility, but rather unusual, that death should result from a fracture of the skull as long as three months afterwards. Another physician testifies, however, that it is probable that the fracture of the skull had some connection with his death. But the death certificate of the deceased was not offered in evidence; nor are any of the circumstances surrounding his death or immediately preceding same shown by the evidence. On the whole, therefore, we do not think that plaintiff's death is shown to have been the result of this accident, and not of natural causes.

The jury found for plaintiff and allowed $12,500. This must be reduced to $3,100.

### Decree.

It is therefore ordered that the judgment appealed from be amended by reducing the sum allowed plaintiff from $12,500 to $3,100, with interest and costs as allowed, and that, as thus amended, said judgment be affirmed; the costs of this appeal to be borne by plaintiff.